JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Tanya Dancekelly,

             Plaintiff,

      v.

Deloitte LLP,

             Defendant.

No. CV 23-4101-DMG (MRWx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter is before the Court following a half-day bench trial that took place on July 1, 2025. Jonathan A. Stieglitz appeared on behalf of Plaintiff Tanya Dancekelly. Kathleen Cahill Slaught and Ryan Robert Tikker appeared on behalf of Defendant Deloitte LLP ("Deloitte"). This action concerns Dancekelly's claim for reimbursement under the Employee Retirement Income Securities Act of 1974 ("ERISA") 29 U.S.C. § 1132(a)(1)(B).

Having reviewed and considered the evidence and the arguments of counsel, as presented at trial and in their written submissions, the Court issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I.

## FINDINGS OF FACT[1]

### Relevant Plan Terms

1. The UnitedHealthcare High Deductible Health Plan (hereinafter the "Plan") is an ERISA self-funded plan sponsored by Deloitte. Administrative Record ("AR") 110.[2] Deloitte entered into an agreement with UnitedHealthcare (hereinafter "United") under which United is the "Claims Administrator[.]" AR 15, 24. Dancekelly is a Deloitte employee under the Plan (hereinafter "Plan participant"). *See* AR 234–238.

2. The Plan "Introduction" states "[i]f there is any conflict between the information presented here, or any written or oral communication by an individual representing the Plan, and the Plan document, the terms of the Plan document as interpreted in the sole discretion of the Plan Administrator will govern; determining the rights and benefits to which [the Plan participant] will be entitled under the Plan." AR 5.

3. "Eligible Expenses" are "the amount the Claims Administrator determines that the Claims Administrator will pay for Benefits." AR 24. The Plan participant is "responsible for paying, directly to the non-Network provider, any difference between the amount the provider bills [the participant] and the amount the Claims Administrator will pay for Eligible Expenses." *Id.*

4. United "as the Claims Administrator, has been delegated the discretion and authority to decide whether a treatment or supply is a Covered Health Service and how the Eligible Expenses will be determined and otherwise covered under the Plan." AR 24. Eligible Expenses are determined "solely in accordance with the Claims Administrator's reimbursement policy guidelines, as described in the SPD." *Id.* SPD refers to the Summary Plan Description. AR 416. For benefits of Covered Health Services by a Non-Network

---

[1] To the extent any of the Court's findings of fact may be considered conclusions of law or vice versa, they are so deemed.

[2] All citations to the A.R. herein will refer to the Bates number included on the record. *See* Doc. # 44. All other citations to the docket will refer to the page number inserted by the CM/ECF system.

provider, Eligible Expenses are based on negotiated rates, at the Claim Administrator's discretion.  AR 24.  If rates have not been negotiated, Eligible Expenses are based on *inter alia* "available data resources of competitive fees in that geographic area."[3]  *Id.*

5.      The Plan "requires prior authorization for certain Covered Health Services." AR 27.   For Covered Health Services from non-Network providers, the participant is "responsible for obtaining prior authorization before [the participant] receive[s] [the] services."  *Id.*

6.      "Covered Expenses are the amount that the Claims Administrator will pay for Benefits" as determined by Deloitte or Deloitte's designee.  AR 32.  "In almost all cases," Deloitte's designee is United.  *Id.*  Deloitte delegates to United "the discretion and authority to initially determine on [Deloitte's] behalf whether a treatment or supply is a Covered Health Service and how the Covered Expenses will be determined and otherwise covered under the Plan."  *Id.*

7.      The Plan provides under "Interpretation of Benefits" that Deloitte and the Claims Administrator "have sole and exclusive discretion" to "Interpret Benefits under the Plan," "[i]nterpret the other terms, conditions, limitations and exclusions of the Plan, including this SPD and any Riders and Amendments," and "[m]ake factual determinations related to the Plan and its Benefits."  AR 117.  Deloitte and the Claims Administrator "may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the plan."  *Id.*

8.      The payment methodology for assistant surgeons is as follows:  "Covered Expenses for assistant surgeon services are limited to 1/5 of the amount of Covered Expenses for the surgeon's charge for the surgery."  AR 74.

---

[3] The Plan states Eligible Expenses for pharmaceutical products are determined using public rates by the Centers for Medicare and Medicaid Services (CMS), and if not published by CMS, gap methodology by OptumInsight or a third-party vendor.  AR 24.  The Covered Health Services at issue are not Pharmaceutical Products, and therefore this portion of the Plan is not relevant to the claims at hand.

9. The Plan provides a section on "[h]ow to [a]ppeal a [c]laim [d]ecision." AR 87. If the Plan participant "disagree[s] with a claim determination after following the above steps,[4] [the participant] can contact the Claims Administrator in writing to formally request an appeal." *Id.* The Plan participant's "first appeal request must be submitted to the Claims Administrator within 180 calendar days after [the participant] receive[s] the claim denial." *Id.* The formal request for an appeal "should include" the patient's name and identification number, the date of medical service, the provider's name, the reason the requester believes the claim should be paid, and any documentation or other written information to support the request for claim payment. *Id.*

10. If the participant is not satisfied with the first level appeal decision, the participant "[has] the right to request a second level appeal." AR 88. The second level appeal "must be submitted to the Claims Administrator no later than 60 calendar days from receipt of first level appeal decision." *Id.*

11. "If, after exhausting [the] internal appeals," the plan participant is "not satisfied with the final determination," the participant "may choose to participate in the external review program." AR 88. The plan participant "may request an independent review of the adverse benefit determination." *Id.* Requests for an independent review "must be made within four (4) months of the date [the participant] receive[s] the adverse benefit determination." *Id.*

12. Under "Limitation of Action," the Plan states the participant cannot bring "any legal action against [Deloitte] or the Claims Administrator to recover reimbursement until 90 calendar days after [the participant] [has] properly submitted a request for reimbursement." AR 119. The legal action must be brought "within three years from the expiration of the time period in which a request for reimbursement must be submitted" or

---

[4] The "above step[]" refers to the option to informally contact Customer Service before requesting a formal appeal. AR 86. The section on this informal step states a Plan participant "may appeal . . . without first informally contacting Customer Service." *Id.*

else the participant loses any right to bring the action. *Id.* The participant "cannot bring any legal action against [Deloitte] or the Claims Administrator for any other reason unless [the participant] first complete[s] all the steps in the complaint process." *Id.* After completing the complaint process, the participant has three years from the date notified of the "final decision" on the complaint to bring legal action. *Id.*

### Dancekelly's Procedures

13. The three procedures at issue in this action are: (1) a hiatal hernia repair (CPT code 43281)[5]; (2) a lap band removal (CPT code 43774)[6]; and (3) a sleeve gastrectomy (CPT code 43775)[7]. AR 733. Dr. Farzin Michael Feizbakhsh[8] is an out of network provider[9] who performed the three procedures on Dancekelly, assisted by Dr. Sean Rim[10], at Bay City Surgery Center (hereinafter "Bay City"). AR 258, 736. Dr. Feizbakhsh is a surgeon associated with Advanced Weight Loss Surgical ("AWLS"). *See* AR 194, 274. Dr. Sean Rim is a surgeon associated with Minimally Invasive Surgical Association ("MIS"). AR 734.

14. Prior to the procedures at hand, Dancekelly underwent laparascopic band surgery in 2010 for the treatment of morbid obesity. AR 789. This procedure was approved

---

[5] The CPT 43281 code description in full is: "[l]aparascopy, surgical, repair of paraesophageal hernia, includes fundoplasty, when performed; without implantation of mesh." AR 211, 216.

[6] The CPT 43774 code description in full is: "[l]aparascopy, surgical, gastric restrictive procedural; removal of adjustable gastric restrictive device and subcutaneous port components." AR 755. *See also* 237 ("LAPS GASTRIC RESTRICTIVE PX REMOVE DEVICE & PORT"), 787 ("LAPS GASTRIC RESCTRICTIVE").

[7] The CPT 43775 code description in full is: "[l]aparascopy, surgical, gastric restrictive procedure; longitudinal gastrectomy (ie, [sic] sleeve gastrectomy). AR 755. *See also* AR 237 ("LAPS GSTRC RSTRICTIV PX LONGITUDINAL GASTRECTOMY"), 787 ("LAPS GSTRC RSTRICTIV PX L").

[8] Throughout the Administrative Record, Dr. Feizbakhsh is also referred to by the name "Michael Feiz." *See* AR 788. For consistency and clarity, the Court will refer to him as Dr. Feizbakhsh.

[9] *See* AR 229.

[10] *See* AR 697.

and covered by insurance. *Id.* In around September or October of 2020,[11] Dancekelly reported to Dr. Feizbakhsh difficulties with her lap band device and exhibited symptoms of vomiting, chest pain, and acid reflux. *Id.* She received multiple adjustments and deflated her band completely in an attempt to alleviate her symptoms. *Id.* These efforts were unsuccessful. *Id.*

15. On November 23, 2020, AWLS called United twice to verify Dancekelly's coverage and/or benefits. AR 749–750. According to United's call logs, the calls were to "VERIFY COVERAGE/BENEFITS" and United quoted Dancekelly's member and plan details. *Id.*

16. On November 24, 2020, Dancekelly underwent an esophagogastroduodenoscopy and biopsy (hereinafter "endoscopy") at Bay City. AR 790. The endoscopy Procedure Report lists the preoperative diagnosis "[d]ysphagia" and the postoperative diagnosis "[h]iatal hernia, possible slippage of lap band." *Id.* The Procedure Report describes Dancekelly as a patient with "history of obesity and lap band procedure who has been having intermittent symptoms of dysphagia and emesis." *Id.* The Procedure Report's findings include "a 2-3 cm hiatal hernia intermittently noted," and that "[t]he band is likely slipped." AR 791. The "gastric body, fundus and cardia show[ed] moderate erythema with diffuse submucosal hemorrhages." *Id.* The "antrum show[ed] moderate erythema and slight nodularity." *Id.* The Procedure Report lists under "Impression": (1) dilated distal esophagus; (2) hiatal hernia; (3) possible slippage of lap band; and (4) gastritis, rule out H. pylori infection. *Id.* As for recommendations, the Procedure Report states Bay City will follow up with biopsy results and "[f]urther recommendations for surgical team with consideration to deflation or removal of the band." *Id.*

---

[11] The AR contains a call record from United dated September 15, 2020. AR 748. The call record shows Dr. Feizbakhsh, as a provider, called United to verify Dancekelly's coverage/benefits. *Id.* This suggests Dr. Feizbakhsh and Dancekelly conferred in some way before September 15, 2020, which prompted Dr. Feizbakhsh's call. *Id.*

17. On December 3, 2020, AWLS called United for a "PRIOR AUTHORIZATION INQ" and United again quoted member details. AR 751.

18. On December 5, 2020, Dr. Feizbakhsh faxed a Letter of Medical Necessity, with the endoscopy Procedure Report attached, to United. AR 788–794. The Letter requested approval of "[r]evision of the [b]ariatric [s]urgery" and reported Dancekelly's symptoms and the results of the endoscopy. AR 789. The Letter of Medical Necessity states, in relevant part, that the endoscopy showed a "significant band migration/herniation," which "[caused] a deformity and erosions of 2 areas of the stomach." *Id.* Dr. Feizbakhsh concluded "[f]urther band adjustments or band replacement would not be advisable. Best strategy would be [] to remove the band and subcutaneous port (43774)." *Id.* The surgical team's recommendations, pending the findings during the endoscopy, were "[p]atrial resection of stomach due to serosal injury (43659) / 43775 gastric sleeve." *Id.*

19. On December 11, 2020, Dr. Feizbakhsh called United to "VERIFY COVERAGE/BENEFITS". AR 752. The call log shows United quoted member details to Dr. Feizbakhsh. *Id.*

20. On December 15, 2020, United issued an authorization approval letter for the lap band removal (CPT 43774) and sleeve gastrectomy (CPT 43775). AR 786–787. The letter was faxed to Dr. Feizbakhsh for the services at Bay City. AR 787. The letter states "authorization is not a guarantee of payment" and a letter confirming the decision would follow. *Id.* The confirmation letter confirmed the lap band removal and sleeve gastrectomy were medically necessary and covered by the Plan. AR 763–767. The letter warns the "approval does not guarantee that the plan will pay for the service" and "depends on plan rules, including coordination of benefits." AR 764.

21. On December 16, 2020, Dr. Feizbakhsh, assisted by Dr. Rim, performed the hiatal hernia repair, lap band removal, and sleeve gastrectomy at Bay City. *See* AR 733 (Provider Remittance Advice ("PRA") for Dr. Feizbakhsh/AWLS), 734 (PRA for Dr. Rim/MIS), 736 (PRA for Bay City).

**Plaintiff's Trial Brief Exhibits[12]**

22.     In support of her Trial Brief, Plaintiff attached a Declaration by Michael F. Feizbakhsh and seven exhibits.  Decl. of Michael F. Feizbakhsh ISO Trial Brief ("Feizbakhsh Decl.") [Doc. # 45-1].  Upon review of the exhibits, Exhibits A through H were all faxed from Dr. Feizbkahsh/AWLS or Dr. Rim/MIS to United in the relevant time period regarding the claims at issue.  [Doc. ## 45-2 (hereinafter "Exhibit A"), 45-3, 45-4, 45-5, 45-6, 45-7, 45-8, 45-9.] These documents were likely before the claims administrator during the claims adjudication process and are therefore part of the administrative record. *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003).  The declaration itself is extrinsic evidence and may only be considered in light of a procedural irregularity, *see infra*.

23.     Exhibit A contains a consultation record and an operative report recorded by Dr. Feizbakhsh regarding the procedures at issue.  [Doc. # 45-2 at 6–8 ("Consultation") and 36–40 (hereinafter "Operative Report").]  The consultation was conducted by Dr. Feizbakhsh on November 24, 2020.  Consultation at 6.  Dr. Feizbakhsh evaluated Dancekelly "for symptoms of dysphagia and emesis." *Id.*  Under "History of Present Illness," Dr. Feizbakhsh wrote Dancekelly "has intermittent episodes of food get[ting] stuck . . . emesis of food at times . . . discomfort at the band site." *Id.*  The consultation states under "Assessment/Plan" that Dancekelly "has been having intermittent symptoms of dysphagia or food gets stuck in her esophagus. She has emesis of the food subsequently. She has intermittent episodes of emesis as well. . . .  The patient will be evaluated by an upper endoscopy to rule out possible esophagitis, hiatal hernia, Barrett's esophagus, gastritis, band erosion, band slippage or any other findings that would contribut[e] to her symptoms." *Id.* at 7.

---

[12] To the extent any Exhibits are duplicative of a document already within the administrative record, the Court will cite to the administrative record.

24.    The operative report is authored by Dr. Feizbakhsh and has a "Date Reported" of December 22, 2020 for the procedures on December 16, 2020.  Operative Report at 37. The operative report lists the "PRE-OP DIAGNOSIS" as "Morbid Obesity (E66.01), Malposition of Gastric Band (K95.09), GERD (K21.9), [and] Hiatal Hernia (K44.9)." *Id.* Her "POST-OP DIAGNOSIS" is "Morbid Obesity (E66.01), Malposition of Gastric Band (K95.09), GERD (K21.9), Hiatal Hernia (K44.9), [and] Extensive Adhesions (K66.0)." *Id.* Her "OPERATIONS PERFORMED" are "Lysis of Adhesions, Removal of Gastric Band and Port, Sleeve Gastrectomy, Hiatal Hernia Repair - Anterior and Posterior, [and] Intraoperative Endoscopy[.]" *Id.*

25.    The operative report walks through the "OPERATURE PROCEDURE" from beginning to end.  The Court will summarize the relevant facts.  *Id.*

26.    An incision was made in the right upper quadrant to gain access into the abdominal cavity.  Dr. Feizbakhsh conducted a diagnostic laparoscopy to assess for injury upon insertion and to assess the level of adhesions.  Dr. Feizbakhsh found adhesions to the liver, stomach, and anterior abdominal wall.  He conducted lysis of adhesions until the stomach and band were localized and the liver was released from the adhesions.  This section of the operative report appears to encompass the **lysis of adhesions**.  *Id.*

27.    Dr. Feizbakhsh then took down the gastric fundoplication and performed a capsulectomy.  The lap band was unbuckled and delivered through the retro gastric tunnel. He removed scar tissue that was restricting the stomach.  This section of the operative report appears to encompass the **lap band removal**.  *Id.*

28.    Dr. Feizbakhsh then dissected and released all attachments to the stomach posteriorly and laterally.  *Id.*  He dissected the hiatus until the left and right crus of the diaphragm were clearly identified.  He developed the planes between the esophagus, pleura, pericardium, spine, and aorta, until the entire hernia sac was brought into the abdomen and resected.  *Id.* at 38–39.  He dissected the hernia sac off of the esophagus to reduce tension until the GE junction and 2-3 cm of the esophagus was comfortable in the abdominal cavity without tension.  *Id.* at 39.  He repaired the posterior hiatal hernia, which

was approximately 2-3 cm, with a 2-0 Ethibond suture on an SH needle in an interrupted fashion. He then repaired the anterior hiatal hernia, which was approximately 2-3 cm, using a 2-0 Ethibond suture on an SH needle in an interrupted fashion over a 36-French bougie. He performed a gastropexy, where he sutured the posterior stomach to the diaphragm, to ensure the "GE junction" would remain in the abdomen. This section of the operative report appears to encompass the **hiatal hernia repair**. *Id.*

29.    Dr. Feizbakhsh then began the gastrectomy approximately 5 cm away from the pylorus. He excised a section of the stomach with an Echelon Linear stapler. He tagged the excised stomach with a suture. He over-sewed the staple line with a 2-0 Vicryl suture with an SH needle in a running fashion. This section of the operative report appears to encompass the **sleeve gastrectomy**. *Id.*

30.    Dr. Feizbakhsh then performed an intraoperative endoscopy to assess for leaks or kinks. He removed the lap band from the body through the 15 mm trocar site and then removed the 15 mm trocar site. He removed "the stomach[,]" presumably the section excised in the sleeve gastrectomy, using a 15 mm EndoCatch bag through a 15 mm periumbilical incision. He removed the port using cautery, sharp, and blunt dissection. At the end of the procedures, Dr. Feizbakhsh confirmed the band, port and all its parts were removed. The 15 mm periumbilical port site was closed using a suture. "All skin incisions" were closed and sealed. *Id.*

### Dr. Feizbakhsh and Dr. Rim's Claims

31.    On March 17, 2021, Dr. Feizbakhsh submitted a bill to United. AR 452–461. On March 18, 2021 and April 15, 2021, Dr. Rim submitted a bill to United. AR 462–481.

32.    On March 21 and 22, 2021, United requested medical records from Dr. Feizbakhsh and Dr. Rim to complete a pre-payment review. AR 517–520 (Dr. Feizbakhsh), 521–531 (Dr. Rim).

33.    On May 10, 2021, United issued a Provider Remittance Advice ("PRA") to Dr. Feizbakhsh/AWLS. AR 733. The PRA denied Dr. Feizbakhsh's bill "because the information requested on [March 21, 2021] [had] not been received." *Id.* The notes reflect

this ground for denial. *See id.* (code PI252 for "an attachment/other documentation is required to adjudicate this claim/service", code HW for "[United] sent a letter for the provider asking for additional information" and "have not received a response", code N706 for "missing documentation") (formatting modified).

34. On May 12, 2021, United issued a PRA to Dr. Rim/MIS. AR 734. The PRA denies the claims on the same lack of documentation basis. *See id.*

35. On May 27, 2021, United sent Dr. Rim/MIS a reminder letter regarding its request for medical records. AR 529–531.

36. On June 28, 2021, United issued a PRA for Bay City. AR 736. United paid $68,525.39 out of $70,000.00 for the hiatal hernia repair, $0.00 out of $90,000.00 for the lap band removal (code PI131 reflects a claim specific negotiated discount, not a denial), and $55,000.00 out of $90,000.00 for the sleeve gastrectomy. *Id.*

37. On November 4, 2021, Dr. Feizbakhsh/AWLS resubmitted his bill. AR 482–489. The bill includes Modifier 59 for the hiatal hernia repair. AR 485. Modifier 59, according to the National Correct Coding Initiative Policy Manual (hereinafter "NCCI Manual"), is defined as a "Distinct Procedural Service[.]"[13] AR 828. The primary purpose of Modifier 59 is to "indicate that two or more procedures are performed at different anatomic sites or different patient encounters." AR 827–828. Modifier 59 allows payment for two procedures. AR 829. Modifier 59 can bypass a "PTP edit" if the "proper criteria for use of the modifier" are met. AR 828–829. NCCI PTP edits "define when two CPT codes may not be reported together, except under special circumstances." AR 829. The PTP edit's function is to "prevent payment for codes that report overlapping services, except in those instances where the services are 'separate and distinct.'" AR 828. If Modifier 59 is warranted, the two CPT codes "may be reported together when the two procedures are performed at different anatomic sites or different patient encounters." AR

---

[13] The Court will consider the NCCI Manual as extrinsic evidence supplementing the record in light of a procedural irregularity, as explained *infra*.

-11-

829.   In other words, assuming a hiatal hernia repair typically cannot be reported and reimbursed separately from a lap band removal and/or sleeve gastrectomy according to the NCCI PTP edit, the provider can use Modifier 59, if the proper criteria supported by documentation in the medical record are met, to receive payment for both procedures. "Documentation must support a different session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries) not ordinarily encountered or performed on the same day by the same individual."  AR 828.

38.   Dr. Feizbakhsh's bill also includes Modifier 22 for the lap band removal.  AR 485.  Modifier 22 is defined as "Increased Procedural Services."  AR 825.  Modifier 22 is not used to bypass a NCCI PTP edit.  AR 825.  Modifier 22 is used if "the service(s) performed is (are) substantially more extensive than the usual services) included in the procedure described by the []CPT code reported."  AR 825.

39.   On November 8, 2021, United processed Dr. Feizbakhsh's bill and issued a PRA.  AR 742.  United paid $0 out of $45,000.00 for the hiatal hernia repair, $1,978.14 out of $45,000.00 for the lap band removal, and $944.89 out of $30,000 for the sleeve gastrectomy. *Id.*

40.   The hiatal hernia repair lists "MOD" (Modifier) 59, "CLM ADJ RSN CD" PR 97, and "REMARK/NOTES" codes HT and N19.  *Id.*   Code PR 97 is for "patient responsibility – the benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated."  AR 742 (formatting modified).  Remark/Note HT is that the "charges are considered an integral part of the primary procedure and not eligible for separate reimbursement."  *Id.* (formatting modified).  Remark/Note N19 is a "procedure code incidental to primary procedure."  *Id.* (formatting modified).

41.   The lap band removal and sleeve gastrectomy both list "REMARK/NOTES" code "UO" which states *inter alia* "provider: this service has been reimbursed using [D]ata iSight, which utilizes cost data (facilities) or paid data (professionals) if available."  *Id.*

(formatting modified).  For the lap band removal, the PRA lists Modifier 22.  *Id.*  A separate pricing statement by Data iSight reflects Dr. Feizbakhsh's reimbursement amounts.  AR 258.  The pricing statement states an amount "ALLOWABLE," an amount "NON-COVERED," and a "CHARGE."  *Id.*  Under "NOTES," it provides certain statements should be included in the "Statement of Benefits" or appear in a check endorsement.  *Id.*  Required statements include:  "[p]aid in accordance with the Data iSight allowance" and "[t]his Pricing Statement is a partial representation of claim data related to repricing of the claim as presented by the provider of care."  *Id.*

42.  In sum, Dr. Feizbakhsh's PRA reflects the hiatal hernia repair was denied as "incidental" to a "primary procedure" and the lap band removal and sleeve gastrectomy were partially reimbursed in accordance with Data iSight's pricing determination.

43.  On November 19, 2021, United sent Dancekelly an Explanation of Benefits ("EOB").  AR 228.  The EOB is a notification that United processed the claim.  *Id.*  The EOB lists the same Remark/Note HT and UO.  AR 229.  The EOB defines HT and UO the same as the PRA.  *Id.*

44.  On December 21, 2021, Dr. Rim/MIS resubmitted his bill to United.  AR 490–497.  Dr. Rim's bill uses Modifier 59 for the hiatal hernia repair, Modifier 22 for the lap band removal, and Modifier 80 for all three procedures.  AR 493.  Modifier 80 is used to indicate an "Assistant Surgeon."  AR 1163.  According to United's Assistant-at-Surgery Services Policy, United's standard reimbursement is 16% of the allowable amount for eligible surgical procedures.  AR 1163.

45.  On December 29, 2021, United processed Dr. Rim's bill and issued a PRA.  AR 746.  United paid $0 out of $45,000.00 for the hiatal hernia repair, $395.63 out of $45,000.00 for the lap band removal, and $188.98 out of $30,000 for the sleeve gastrectomy.  *Id.*  The hiatal hernia repair lists "MOD" (Modifier) 59 and 80, "CLM ADJ RSN CD" PR 97, and "REMARK/NOTES" HT and N19.  *Id.*  Notes HT and N19 are identical to Dr. Feizbakhsh's PRA.  *Compare* AR 746 *with* AR 742.  The lap band removal and sleeve gastrectomy both list "REMARK/NOTES" code UO, which is the same as Dr.

Feizbakhsh's PRA, and Modifier 80. *Id.* In addition, the lap band removal lists Modifier 22. *Id.*

46. In sum, Dr. Rim's bill was denied or partially reimbursed for the same reasons as Dr. Feizbakhsh's bill, with an additional reduction for Dr. Rim's role as an assistant surgeon.

### Dr. Feizbakhsh's Appeal

47. From April 2022 through October 2022, in response to appeals by Dr. Feizbakhsh on behalf of Dancekelly, United sent multiple letters denying the appeal on the basis that United had not received a designation of representation ("DOR") authorization from Dancekelly. *See* AR 555–557 (April 20, 2022), 583–585 (July 21, 2022), 627–629 (August 10, 2022), 667–669 (October 11, 2022).

48. On October 14, 2022, Dr. Feizbakhsh/AWLS faxed United an appeal with a DOR signed August 31, 2022 attached. AR 190–202. On October 19, 2022, Dr. Feizbakhsh/AWLS uploaded a DOR titled "12.16.20" to United's web portal. AR 502–504.

49. Dr. Feizbakhsh's appeal, labeled "LEVEL 1 APPEAL OF CLAIM DENIAL," asserted Dancekelly incorrectly received a denial of her claim for payment of his services. AR 194–199, 243–250.

50. On October 27, 2022, United responded to Dr. Feizbakhsh's appeal. AR 211; *see also* AR 253. United determined the "request for payment was processed correctly." AR 211. The letter states, in relevant part, that use of Modifier 59 for the hiatal hernia repair "remain[ed] not supported" because the medical records "[did] not support that the procedure or service was distinct or independent from other services performed." *Id.* at 211–212. Because the hiatal hernia repair code "is included" in the sleeve gastrectomy (CPT 43775) and Modifier 59 purportedly did not apply, the hiatal hernia repair could not be separately reimbursed. AR 212. A "FWAE Member Determination Form" repeats the same rationale for the hiatal hernia repair. AR 216.

-14-

51.    The letter also states "[t]his claim has been reimbursed using Data iSight, which utilizes cost data, if available (for facilities), or paid data (for professionals).  AR 212.  The letter provides Dancekelly or her authorized representative "may request a second level review."  AR 213.  If United continues to "deny the payment, coverage, or service requested or [Dancekelly] [does] not receive a timely decision," she "may be able to request an external review of [the] claim by an independent third party, who will review the denial and issue a final decision."  AR 213.

52.    On October 28, 2022, United sent Dr. Feizbakhsh/AWLS a letter in response to his request for information.  AR 222.  The letter states:

> You [Dancekelly] requested a copy of certain plan documents, including the Summary Plan Description (SPD).  Please understand that we provide certain administrative services to the sponsor of this group health plan. Distribution of the SPD, Form 5500, and/or other plan documents is not a service we provide. You may contact the employer group directly to obtain a copy of those documents.

AR 222.  The letter attaches "the information UnitedHealthcare used in making the determination":  Intranet Benefit At a Glance (IBAGG); Explanation of Benefits (MEOB); Claim Image; Clinical Review; ELGS Letter; Appeal Letter; Resolution Letter; Shared Savings Program.  AR 222.  The letter does not include any mention of rates or data regarding fees.

53.    On November 4 and 5, 2022, Dr. Feizbakhsh/AWLS sent a "FINAL APPEAL" to United.  AR 266, 293.  The fax cover sheet for the November 5, 2022 "FINAL APPEAL" states "[a]s per our conversation with representative Andy C. with call reference # 5413, we were advised that the initial appeal was upheld."  AR 266.  AWLS enclosed a detailed letter entitled "FINAL APPEAL OF CLAIM DENIAL."  AR 268.  The enclosure states "this is our Final Level of appeal" and provides an overview of the procedures and appeal.  AR 268–272.  AWLS asserted, in relevant part, that United "dishonored the terms described in [Dancekelly's] plan by processing this claim by using an unknown fee

schedule."    AR 269.    Under "Discrepancies in Payment Determination" the enclosure includes:

> Before services were rendered, we called the plan/TPA to verify and pre-certify the proposed services were covered under the Plan.  Upon supplying the plan, the Current Procedural Terminology codes "CPT" codes 43281, 43774, and 43775 under no circumstances did the plan disclose for the same CPT codes **would pay using an unknown fee schedule's limits and values**. Based on the information gathered, the patient decided to move forward with services believing her claim would be processed according to her plan which would reduce patient responsibility and liability for payment.

AR 270 (emphasis in original).  The faxed documents included a DOR from Dancekelly for Dr. Feizbakhsh/AWLS signed on December 16, 2020.  AR 274, 301.

54.    On November 17 and 18, 2022, United requested a DOR in response to Dr. Feizbakhsh's/AWLS's "Final Appeal."  AR 281, 308.  An internal note from United's Escalation Tracking System ("EWS") states on November 16, 2022, the United analyst found the "[A]uth on file was expired hence case close member auth letter send."  AR 305. The attached DORs were signed in 2020 and state "this authorization will expire one year from the date [the signer] sign[s] the authorization.  AR 274, 301.

55.    On December 20, 2022, Dr. Feizbakhsh/AWLS resubmitted his final appeal. AR 315–318.  The fax cover sheet states "[a]s per [their] conversation with representative MARKI call reference # 9193, [they] were advised to resubmit the appeal with DOR form to process the final appeal."  AR 315.  The letter contains the same language as the other "FINAL APPEAL" regarding the fee schedule and pre-certification.  *Id.*  He attached the same DOR signed in 2020.  AR 319.

56. On January 5, 2023, Dr. Feizbakhsh/AWLS resubmitted his final appeal with a DOR signed on August 31, 2022.  AR 333–343.  United again requested a new DOR on February 13, 2023.  AR 365, 719.

57.     On March 11, 2023, United sent a letter response to Dr. Feizbakhsh's request for information.  AR 416.  The letter again declines to provide the SPD/Plan on the same ground, and attaches the "information UnitedHealthcare used in making the determination:"  Intranet Benefits At A Glance, Explanation of Benefits, Claim Submission, Clinical Review, Pricing Statement, and Appeal Letter.  AR 416.

58.     On March 27, 2023, United issued a decision on Dr. Feizbakhsh/AWLS's final appeal.  AR 376.  United found it processed Dancekelly's claim correctly and repeated the same rationale, including that the use of the 59 modifier is not supported and the claim was properly reimbursed using Data iSight.  AR 376–383.

**Dr. Rim's Appeal**

59.     On July 26, 2022, United requested a DOR from Dancekelly in response to Dr. Rim's "request regarding Tanya Dancekelly" for a claim on a procedure conducted on December 16, 2020.  AR 611–613.  The letter has a "LETTER ID" of "APPEAL001."  AR 611.  United again requested a DOR on August 13, 2022.  AR 639.  On September 27, 2022, Dr. Rim/MIS faxed United a DOR signed by Dancekelly on August 31, 2022.  AR 175–177.

60.     On September 29, 2022, United again requested a DOR from Dr. Rim/MIS.  AR 659–661.  On October 7, 2022, Dr. Rim faxed an "APPEAL OF CLAIM DENIAL" "Level I Appeal" dated September 12, 2022 to United.  Feizbakhsh Decl., Exhibit F [Doc. # 45-7 at 3, 5.][14]  The appeal identifies the procedures at issue and asserts the claim should be reconsidered and paid in full because Bay City's claims were approved.  *Id.*  The appeal requests United reprocess the claim and produce the "entire administrative record as it relates to the member's adverse benefit determination."  *Id.*  The fax included a DOR signed December 16, 2020.  *Id.* at 6.  On October 19, 2022, Dr. Rim/MIS uploaded a DOR labeled "12.16.20" to United's web portal.  AR 509–512.

---

[14] This document is part of the administrative record that was before the claims administrator when it made its decision.  *See supra.*

61. On November 4, 2022 Dr. Rim/MIS again faxed United his appeal. [Doc. # 45-8 at 2–3.][15] The fax cover sheet states "[a]s per our conversation with representative Chay C. with call reference # 5727, we were advised that you did not receive the initial appeal that we sent last 11/04/2022 for billing provider MISA/Dr. Sean Rim (Assistant Surgeon)." *Id.* at 2. The attached document is Dr. Rim/MIS's "APPEAL OF CLAIM DENIAL" and dated January 3, 2023. *Id.* at 3.

62. United continued to make repeated requests for a DOR. AR 689–691 (November 5, 2022), 697–699 (November 23, 2022), 707–709 (January 5, 2023).

63. On January 5, 2023, Dr. Rim/MIS faxed United an appeal and DOR signed by Dancekelly on August 31, 2022. AR 335–343. The document states "[a]s per our conversation with representative Victor M. with call reference # 5532, we were advised to resend the appeal with the correct and signed member authorization to reprocess the appeal." AR 335. The enclosed document is titled "APPEAL OF CLAIM DENIAL" and is dated September 27, 2022. AR 337.

64. On January 28, 2023, United sent a response letter to MIS denying the appeal. AR 350. The letter denies the appeal on the basis that "an initial appeal request must be made within 60 days of the last date the claim was processed or denied." AR 350.

## Order on the Administrative Record

65. The Court granted in part and denied in part Dancekelly's motion to set the Administrative Record. [Doc. # 48.] The Court ruled, in relevant part, that Exhibit B to the First Amended Complaint was included in the AR. [Doc. # 48 at 3–4.] Exhibit B is a screenshot of United's website. [Doc. # 34 ("FAC") at 14.] The website page entitled "Information on Payment of Out-of-Network Benefits" states, in relevant part, that United will pay an out-of-network benefits claim based on the terms of the plan. *Id.* Plans "in many cases provide[] for payment for amounts that are the lower of either: the out-of-network provider's actual charge billed to the member, or 'the reasonable and customary

---

[15] *See id.*

-18-

amount,' 'the usual, customary, and reasonable amount,' 'the prevailing rate,' or other similar terms that base payment on what other healthcare professionals in a geographic area charge for their services." *Id.* A plan may use resources that "contain information on the charges or costs for professional services or supplies" to determine these amounts and the prevailing rate. *Id.* "The resource used for payment of professional services is based on what other health care professionals in the relevant geographic areas or regions charge for their services." *Id.*

66.    The Court deferred ruling on Exhibit A and D and will address both *infra* following its determination of the applicable standard of review.  [Doc. # 48 at 3–5].

## II.

## CONCLUSIONS OF LAW

1.    The Plan is an employee welfare benefit plan governed by ERISA, which provides the exclusive remedy for Dancekelly's claims. *See* 29 U.S.C. § 1132(a)(1)(B).

2.    The Court has subject matter jurisdiction pursuant to ERISA, 29 U.S.C. section 1132(a), and 28 U.S.C. section 1331.

3.    Dancekelly bears the burden of proving her entitlement to benefits under the Plan by a preponderance of the evidence.  *See Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1294 (9th Cir. 2010); *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1123 (C.D. Cal. 2015).  "ERISA is remedial legislation that should be construed liberally to protect participants in employee benefits plans." *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1185–86 (9th Cir. 2022) (quoting *LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1236 (9th Cir. 2015)).

## Standard of Review

4.    A district court reviews an administrator's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989)).  If the benefit plan does grant the administrator discretionary authority, then the district court reviews the administrator's decision under the abuse of discretion standard of review.  *Id.*  Abuse of discretion is a "deferential standard of review."  *Firestone*, 489 U.S. at 111.

5.    For abuse of discretion review to apply, the plan must "unambiguously provide discretion to the administrator."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999)).  No "magic . . . words" are required.  *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000).  Discretion must be "unambiguously retained" by the administrator.  *Kearney*, 175 F.3d at 1090 (quoting *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1325 (9th Cir. 2022)).  "[T]he default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision."  *Id.* at 1089.  Plan language that specifically uses the word "discretion" to describe the administrator's authority is oftentimes sufficient.  *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Emps. of Transferred GE Operations*, 244 F.3d 1109, 1113 (9th Cir. 2001).

6.    The plain language of the Plan unambiguously vests United with the "discretion and authority" to determine whether a treatment is a Covered Health Service and how the Covered Expenses will be adjudicated under the Plan.  It also unambiguously vests United with the sole and exclusive discretion to interpret the Plan and make factual determinations related to the Plan and its Benefits.

7.    Under ERISA, a plan administrator/named fiduciary may delegate its fiduciary responsibilities.  *Madden v. ITT Long Term Disability Plan for Salaried Emps.*, 914 F.2d 1279, 1283 (9th Cir. 1990); *see also Velikanov v. Union Sec. Ins. Co.*, 626 F. Supp. 2d 1039, 1048 (C.D. Cal. 2009).  Section 1105 provides: "[t]he instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out

fiduciary responsibilities (other than trustee responsibilities) under the plan." 29 U.S.C. § 1105(c)(1). Where "(1) the ERISA plan expressly gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan and (2) pursuant to ERISA, 29 U.S.C. § 1105(c)(1) [], a named fiduciary properly designates another fiduciary, delegating its discretionary authority," the same standard of review applies to the named fiduciary and the fiduciary who was delegated authority. *Madden*, 914 F.2d at 1283–84; *accord James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 872 (N.D. Cal. 2014).

8. United is permitted under the Plan to delegate its discretionary authority to interpret the Plan and make factual determinations related to the Plan and its Benefits to other persons or entities. The record reflects United made claim determinations "using Data iSight" and the claim is "paid in accordance with the Data iSight allowance." There is no evidence in the record otherwise showing United made a factual determination as to pricing. Accordingly, the Court finds United delegated its discretionary authority to make pricing determinations to Data iSight, as expressly permitted under the Plan. Under *Madden*, the same standard of review applicable to United also applies to Data iSight. *Madden*, 914 F.2d at 1283–84.

9. The Court therefore reviews denial of Dancekelly's benefits and all determinations therein, including those by United and Data iSight, under the abuse of discretion standard.

### The Degree of Deference

10. The degree of deference accorded to a claims administrator's decision in an abuse of discretion review "can vary significantly." *Saffon*, 522 F.3d at 867.

11. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Abatie*, 458 F.3d at 965 (9th Cir. 2006) (quoting *Firestone*, 489 U.S. at 115). Dancekelly does not assert there is a conflict of interest. Deloitte is the funder of the Plan and United is the Claims Administrator, and

therefore there is no structural conflict of interest of the kind present when a plan administrator both evaluates and pays claims for benefits. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008); *see also Abatie*, 458 F.3d at 965. Even without a conflict of interest present, however, "deference to the plain administrator's judgment does not mean that the plan prevails." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). The word "deference" "is not a 'talismanic word[] that can avoid the process of judgment.'" *Id.* (quoting *Glenn*, 554 U.S. at 119).

12. Where a plan administrator has exercised discretion but, in doing so, made procedural errors, the Court continues to apply an abuse of discretion standard of review. *Abatie*, 458 F.3d at 972; *see also Conkright v. Frommert*, 559 U.S. 506, 513 (2010) (holding a "single honest mistake" in plan interpretation does not justify changing the standard of review from abuse of discretion to *de novo*). The procedural irregularity is "weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972. More serious procedural irregularities weigh more heavily than minor irregularities. *Id.*

13. A procedural irregularity occurs where "a plan administrator has exercised discretion but, in doing so, has made procedural errors." *Abatie*, 458 F.3d at 972. "Under ERISA, plan administrators must follow certain practices when processing and deciding plan participants' claims." *Id.* at 971. The Plan must provide "adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). In addition, any participant denied benefits must be "afford[ed] a reasonable opportunity to . . . a full and fair review." 29 U.S.C. § 1133(2).

14. The Department of Labor has promulgated regulations that set forth the minimum requirements for a claim procedure to satisfy ERISA. 29 C.F.R. § 2560.503–1. "The notice of claim denial must contain: (1) '[t]he specific reason or reasons for the denial'; (2) '[r]eference to the specific plan provisions on which the determination is

based'; (3) '[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary'; and (4) '[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review.'" *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1185 (9th Cir. 2022) (quoting 29 C.F.R. § 2560.503–1(g)(1)(i)–(iv)).

15. Dancekelly claims six irregularities: (1) United represented no preauthorization was required for the hiatal hernia repair and represented all three procedures were covered; (2) United reimbursed the full billed amount for the hiatal hernia repair for Bay City, but denied the same for Dr. Feizbakhsh's and Dr. Rim's claims; (3) United did not explain why the hiatal hernia repair was incidental to the sleeve gastrectomy; (4) United did not produce the NCCI Manual to Dancekelly; (5) the NCCI manual does not support United's claim determination; and (6) the administrative record lacks certain documents (the operative report, pricing data, appeal letters, call recordings).

16. *Abatie* contemplates *procedural* irregularities, not *any* purported inconsistency the claimant can argue. Indeed, Dancekelly fails to connect many of these "irregularities" to any specific requirements under ERISA. *See Martinez v. Beverly Hills Hotel*, 695 F. Supp. 2d 1085, 1104 (C.D. Cal. 2010) (finding procedural irregularities pursuant to specific ERISA regulations). Moreover, Dancekelly's arguments regarding the Bay City discrepancy, substantive lack of support in the NCCI manual, and change of heart as to preauthorization, go to the merits of the claim denial rather than errors in procedure. The Court turns to the remaining alleged irregularities.

### *Lack of Specific Reasons*

17. The claims administrator must provide "specific reasons" for the denial. 29 U.S.C. § 1133(1); 29 C.F.R. § 2560.503–1(g)(1)(i), (j)(1). "If benefits are denied in whole or in part, the reason for the denial must be stated in clear language, with specific reference

to the plan provisions that form the basis for the denial." *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (citing 29 C.F.R. § 2560.503–1).

18.     Regarding the hiatal hernia repair, the PRAs are devoid of necessary detail. The PRAs list Remark/Note N19 for the hiatal hernia repair, which is explained as a "procedure code incidental to primary procedure," but they do not specify what the "primary procedure" is.  The PRAs identify Modifier 59 for the hiatal hernia repair, but it is not readily apparent to the claimant what the purpose of Modifier 59 is and whether the use of the modifier was allowed or denied.  Moreover, there is no reference to any applicable plan provision.  Only in its response to Dr. Feizbakhsh and Dr. Rim's appeals, sent over one year after the PRAs, did United explain the "primacy procedure" was the sleeve gastrectomy and that it denied the use of Modifier 59.

19.     A "court will not allow an ERISA plan administrator to assert a reason for denial of benefits that it had not given during the administrative process." *Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012).  Deloitte justifies United's denial through the NCCI Manual's particular guidelines regarding hiatal hernia repairs.  Namely, Deloitte references the NCCI Manual's guidance in these sections:

> If a hernia repair is performed at the site of an incision for an open or laparoscopic abdominal procedure, the hernia repair (e.g., CPT codes 49560-49566, 49652-49657) is not separately reportable.  The hernia repair is separately reportable if it is performed at a site other than the incision and is medically reasonable and necessary. An incidental hernia repair is not medically reasonable and necessary and shall not be reported separately.

AR 957.

> CPT codes 43281 and 43282 describe laparaoscopic paraesophageal hernia repair with fundoplasty, if performed, without or with mesh implantation respectively. These codes shall not be reported for a figure-of-eight suture often performed during gastric restrictive procedures.

AR 961.

20. Although United did identify the general basis behind its denial of the hiatal hernia repair in the PRAs (that it was "incidental to" the sleeve gastrectomy), United did not mention these NCCI Manual-specific rationales on incisions, sutures, or whether the hernia repair was "medically reasonable and necessary" to Dancekelly during the administrative review process.

21. In *Solis*, the Ninth Circuit reversed and remanded the district court's order reviewing a similar denial by United of a hiatal hernia repair claim. *Solis v. T-Mobile US, Inc.*, No. 24-2412, 2025 WL 1937089, at *2 (9th Cir. July 15, 2025). The Ninth Circuit held that the district court's finding that the standard of review was an abuse of discretion was correct. *Id.* at *1. It also affirmed the district court's finding that United's lack of *specific* explanation under *Harlick* constituted a procedural irregularity. *Id.* at *2. The Ninth Circuit's conclusions apply with equal force here. Indeed, although the figure-of-eight suture, incision sites, and procedure timing "may all find some support in the NCCI Manual, Defendants notably did not present them to Plaintiffs during the administrative review process." *Id.* If, for example, United's denial specified the hiatal hernia repair was incidental to the primary procedure because there was only a single incision point, Dancekelly "could have responded by providing additional evidence of different incision points." *Id.* By "failing to provide such specificity," United "denied [Dancekelly] the opportunity to adequately respond during the administrative claims process." *Id.*

### Copies of Relevant Records

22. Upon appeal of an adverse benefit determination, pursuant to ERISA's requirement that a claimant be provided a full and fair review, an ERISA claimant is entitled, "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503–1(h)(2)(iii). A document, record, or other information is "relevant" if it: "(i) [w]as relied upon in making the benefit determination; (ii) [w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the

benefit determination;" or "(iii) [d]emonstrates compliance with the administrative processes and safeguards" required in the regulation "in making the benefit determination." 29 C.F.R. § 2560.503–1(m)(8).

23.    In addition, ERISA requires an administrator, upon written request of any participant, to furnish a copy of documents related to the Plan, including "a copy of the latest updated summary" and a "plan description[.]"  29 U.S.C. § 1024(b)(4); *Crotty v. Cook*, 121 F.3d 541, 548 (9th Cir. 1997).

24.    In response to Dr. Feizbakhsh/AWLS' request for information, including a request for a copy of the Plan (the SPD), United did not produce any documents related to the Plan on the basis that it is not a "provide[d]" "service" and Dancekelly should instead request documents from Deloitte.  The Plan does not indicate, however, who has the responsibility to produce the Plan and related documents to a claimant.  Dr. Rim/MIS's appeal similarly includes a request for the entire administrative record.  Instead of providing *any* documentation, United claimed Dr. Rim's appeal was untimely.  United procedurally erred by failing to provide copies of the relevant Plan records.

25.    United did not produce any recordings of the calls between Dr. Feizbakhsh/AWLS / Dr. Rim/MIS and United. At trial, United's counsel confirmed recordings of the calls were not preserved or produced by United.  Telephone conversations and recorded records regarding the claims were "generated in the course of making the benefit determination" and United's failure to preserve and provide them was a procedural error.  *Accord Rowell v. Aviza Tech. Health & Welfare Plan*, No. CV 10-5656-PSG, 2011 WL 5190172, at *6 (N.D. Cal. Oct. 31, 2011), *on reconsideration in part*, No. CV 10-5656-PSG, 2012 WL 440742 (N.D. Cal. Feb. 10, 2012) (reconsidered on other grounds).

### *Good Faith Exchange*

26.    When an administrator can show it engaged in an "ongoing, good faith exchange of information between the administrator and the claimant . . . the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Abatie*, 458 F.3d at 972 (quoting *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income*

*Prot. Plan*, 349 F.3d 1098, 1107 (9th Cir. 2003)) (internal punctuation and quotation marks removed). United has not shown any attempts at good faith exchanges of information with Dr. Feizbakhsh/AWLS and Dr. Rim/MIS to mitigate these procedural irregularities. Instead, the record shows repeated denials of both appeals for lack of a DOR.[16]  Dr. Feizbakhsh/AWLS and Dr. Rim/MIS both faxed a non-expired DOR early in the appeal process. Although they also faxed and uploaded an expired DOR in other instances, at no point did United explain in its requests why the earlier non-expired DORs were insufficient. As reflected in the fax cover sheets, Dr. Feizbakhsh and Dr. Rim proactively reached out to United in order to deduce the issue. Upon being informed, the doctors faxed additional non-expired DORs. Even following these calls and re-submissions, United continued to send the same generic DOR request until it finally responded to the appeals at an arbitrary point in time. Such a chaotic pattern of communication cannot be deemed a good faith exchange of information.

27. The Court will therefore appropriately weigh these procedural irregularities when deciding whether an administrator's decision was an abuse of discretion *infra*.

## **Extrinsic Evidence**

28. Under an abuse of discretion standard of review, the Court may not consider evidence outside the administrative record. *Abatie*, 458 F.3d at 970. The administrative record is limited to what was before the plan administrator when the decision was made. *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003). If the procedural irregularities "have prevented full development of the administrative record," the Court may consider evidence outside of the administrative record. *Abatie*, 458 F.3d at 973. In doing so, the Court "in essence, recreate[s] what the administrative record would have been had the procedure been correct." *Id.*

---

[16] Dancekelly claims United's initial denials for Dr. Feizbakhsh/AWLS's and Dr. Rim/MIS's failures to provide the requested medical records were erroneous, however, the Court finds no evidence in the record to support this assertion. For example, there is no record in the AR showing Dr. Feizbakhsh/AWLS or Dr. Rim/MIS sent the requested documentation in the relevant time period.

29. FAC Exhibit A, the call verification sheet, was not before United when the decision was made because it is an internal record from Dr. Feizbakhsh/AWLS. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 632 n.4 (9th Cir. 2009). At trial, Dancekelly established a sufficient foundation that the call verification sheet is a record of the calls that occurred between AWLS and United based upon the matching call reference number located on the call verification sheet and United's records. *Compare* Doc. # 34 at 12 ("REF # 5066 / 7544") *with* AR 749 ("D03281326335066"), 750 ("D03281753487544"). The call verification sheet shows for "CPT CODES" "43281 HERNIA" that it is "YES" for "COVERED?" and "NO" for "PRE AUTH REQ?". Doc. # 34 at 12. The Court may consider FAC Exhibit A as extrinsic evidence in light of United's failure to produce call recordings. *Abatie*, 458 F.3d at 973.

30. FAC Exhibit D is a study by the American College of Surgeons and other surgical specialty organizations. Deloitte and United do not claim United relied upon this study in its claim determinations. FAC Exhibit D does not flow from the procedural irregularities present in this case and the Court will not consider it. *See* Doc. # 47 at 4–5.

31. The Court will consider the NCCI Manual. As explained *supra*, United's failure to provide the specific explanations contained in the NCCI Manual constituted a procedural irregularity. The remedy for such a procedural irregularity under *Abatie* is for the Court to consider the extra-record material so it may "in essence, recreate what the administrative record would have been had the procedure been correct." *Abatie*, 458 F.3d at 973. At the hearing and through pre-trial briefing, Dancekelly was afforded a fulsome opportunity to respond to Deloitte's NCCI Manual arguments. *See Solis*, 2025 WL 1937089 at * 2 (reversing the district court's denial of plaintiffs' request to submit supplemental evidence after the bench trial). The Court will therefore consider the NCCI Manual and any related supplemental argument and evidence in that regard.

### Exhaustion of Dr. Rim's Claim

32. As a threshold matter, Dr. Rim's claims were properly exhausted. ERISA itself does not require a participant to exhaust her administrative remedies. *Vaught v.*

*Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008).  In the Ninth Circuit, as a doctrine of prudential exhaustion, a "claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court." *Id.* (quoting *Diaz v. United Agr. Emp. Welfare Ben. Plan & Tr.*, 50 F.3d 1478, 1483 (9th Cir. 1995)).

33.    Upon review of the Plan, the Court finds the Plan does not *require* a participant to file a first or second level appeal.  Rather, the Plan states the participant "can" contact the Claims Administrator to request the first level appeal, and if the participant does so, it "must be submitted to the Claims Administrator within 180 calendar days" after the participant receives the claim denial.  Similarly, the participant "has the right" to request a second level appeal and "may choose" to participate in an external review program following.  Both levels of appeal, and the external review program, have a time limit *if* exercised.  Indeed, the Plan places two requirements on the participant before she may bring any legal action to recover reimbursement, neither of which mention an appeal: she must wait 90 calendar days following the submission of the request for reimbursement and she must bring it within three years.  For "any other reason," i.e., for any legal action other than one to recover reimbursement, the participant must first complete all the steps in the complaint process.  Under this voluntary language, Dr. Rim was not required to file an appeal regarding his claim for reimbursement.

34.    Even if required to file an appeal, the evidence in the AR suggests Dr. Rim likely timely did so.  Dr. Rim's received the PRA on December 29, 2021.  Dr. Rim's first appeal, if filed, would be due in 180 days (June 27, 2022).  Although the AR does not contain a record of Dr. Rim's first appeal, it does contain a DOR request from United to Dr. Rim on July 26, 2022.  The request was sent *in response to* Dr. Rim and labeled itself "APPEAL 001."  Based on the date of this DOR request, there is sufficient evidence in the record from which a reasonable inference can be drawn that Dr. Rim filed a first appeal sometime before July 26, 2022, which is close in time to his 180-days deadline.  Because of United's repeated DOR requests, even after Dr. Rim uploaded a DOR to United's web portal, it appears United did not process Dr. Rim's first appeal until he faxed it on January

5, 2023 with a new DOR. Instead of recognizing Dr. Rim had been responding to United's DOR requests since July of 2022, and United had not processed the first appeal on this basis, United construed the January 5, 2023 appeal as Dr. Rim's final appeal. This is apparent because United relied upon the 60-day deadline required for a final appeal rather than the 180-day deadline required for a first appeal.

35.    In sum, although not required, it is evident that Dr. Rim did file a first appeal which was likely timely, United did not respond to the first appeal, United made repeated requests for a new DOR, and it erroneously denied Dr. Rim's first appeal as an untimely final appeal (therefore implicitly acknowledging that Dr. Rim did file a first appeal).

### Abuse of Discretion Review

36.    The test for abuse of discretion in a factual determination is whether the Court is "left with a definite and firm conviction that a mistake has been committed." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009)). The Court may not merely substitute its review for that of the fact finder. *Id.* The administrator's interpretation of the plan "will not be disturbed if reasonable." *Id.* at 675 (quoting *Conkright*, 559 U.S. at 1651). To make this determination, the district court considers whether "application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Salomaa*, 642 F.3d at 676 (quoting *Hinkson*, 585 F.3d at 1262). *See also Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1042 (9th Cir. 2014) ("A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination.") (quoting *Anderson v. Suburban Teamsters of N. Illinois Pension Fund Bd. of Trs.*, 588 F.3d 641, 649 (9th Cir. 2009)).

37.    Under the aforementioned standard, United's denial of Dr. Feizbakhsh/AWLS's and Dr. Rim/MIS's claim for the hiatal hernia repair and partial reimbursement of the lap band removal and sleeve gastrectomy was an abuse of discretion.

**The Hiatal Hernia Repair Was Not Incidental to the Sleeve Gastrectomy**

38.     United's determination that the hiatal hernia repair was incidental to the sleeve gastrectomy was illogical, implausible, and without support in the factual record.

39.     The factual record shows Dancekelly's hiatal hernia existed *prior* to her procedures. The consultation conducted by Dr. Feizbakhsh flagged the possibly of a hiatal hernia and ordered an endoscopy as the next step to determine whether she had a hiatal hernia. The endoscopy had the same preoperative diagnosis and confirmed the existence of the hiatal hernia. The operative report lists a hiatal hernia under "pre-op diagnosis" and "post-op diagnosis." Based upon the operative report, Dr. Feizbakhsh, assisted by Dr. Rim, first conducted the lap band removal, then the hiatal hernia repair, then finally the sleeve gastrectomy. In sum, the hiatal hernia was diagnosed long before the sleeve gastrectomy took place, confirmed by endoscopy, and was a standalone medical condition to be operated on by Dr. Feizbakhsh and Dr. Rim.

40.     According to the operative report, the hiatal hernia repair was conducted *prior to* the sleeve gastrectomy. Logically, a procedure conducted prior to another procedure cannot be incidental to the latter. Rather, the phrase "incidental to" suggests a hiatal hernia that *results* from a sleeve gastrectomy would not be covered.

41.     The endoscopy revealed erosions in two areas and the operative report reflects repairs in both the posterior hiatal hernia *and* the anterior hiatal hernia. This constitutes medical documentation that Dancekelly had a separate injury or area of injury, which would support use of Modifier 59 and reimbursement of both procedures under the NCCI Manual's guidance.

42.     The NCCI Manual advises the hernia repair is separately reportable if it is medically reasonable and necessary. The consultation, endoscopy, and operative report, all show that Dancekelly suffered from vomiting, chest pain, and acid reflux, and was pre-diagnosed with the hiatal hernia. The hiatal hernia was confirmed by the endoscopy, identified prior to the procedures, and resolved by the procedures. The record supports a

-31-

conclusion that the hiatal hernia repair addressed adverse symptoms on its own (separate and apart from any other condition) and was medically reasonable and necessary.

43.     The NCCI Manual advises a hernia repair is separately reportable if it is performed at a different site of an incision for an open or laparascopic abdominal procedure.  The use of Modifier 59 is allowed if there are separate incision/excisions.  The operative report shows more than one incision was made and there were at least two excision points (the trocar site and the periumbilical incision).

44.     There is no factual support in the record showing the use of a figure-of-eight suture.  At no point does the operative report state use of a figure-of-eight suture.  The hiatal hernia sutures were at two different locations, one for the posterior hiatal hernia and the anterior hiatal hernia.  Neither suture mentions a figure-of-eight.  The suture at the sleeve gastrectomy does not mention a figure-of-eight.

45.     In support of its position, Deloitte cites *Arnold v. United Healthcare Ins. Co.*, No. CV 23-3974-PA (AGRx), 2024 WL 549032, at *3 (C.D. Cal. Feb. 12, 2024).  This case is distinguishable from *Arnold*.  In *Arnold*, the plaintiff underwent a bariatric sleeve gastrectomy to treat her obesity.  In preparing for the bariatric sleeve gastrectomy, the hiatal hernia was identified as a potential complication *of* the bariatric surgery.  *Id.*  Here, Dancekelly already underwent laparascopic band surgery to treat her obesity about 10 years before the procedures at hand.  Her hiatal hernia was diagnosed as a standalone issue and not a complication of a distinct procedure pre-confirmed as unauthorized.  Moreover, the district court in *Arnold* made the factual finding that there was only one incision site.

46.     As for *Solis*, upon which Deloitte also relies, the Ninth Circuit held the district court in *Solis* erred by applying the incorrect test for an abuse of discretion.  *Solis v. T-Mobile USA, Inc.*, No. CV 23-04024-SVW (PDx), 2024 WL 1117897, at *15 (C.D. Cal. Mar. 14, 2024), *vacated and remanded sub nom. Solis v. T-Mobile US, Inc.*, No. 24-2412, 2025 WL 1937089 (9th Cir. July 15, 2025).  The Court does not rely on *Solis*.

//

//

-32-

**United's Pricing Determinations Were an Abuse of Discretion**

47.     The Plan states that Eligible Expenses for Covered Health Services by a Non-Network Provider are based on negotiated rates. If rates have not been negotiated, Eligible Expenses are based on available data resources of competitive fees in that geographic area. Similarly, United's website indicates that prevailing rates are based on data derived from charges by healthcare professionals in a geographic area.

48.     The PRAs state the service is reimbursed using Data iSight, which utilizes cost data for facilities or paid data if available for professionals. The Data iSight pricing statements in turn state it is a partial representation of claim data related to repricing of the claim.

49.     Any discrepancy in reimbursement compared between Bay City and Dr. Feizbakhsh/Dr. Rim is reasonable on the basis that Bay City is a facility. The Bay City PRA adequately explains pricing differences between facilities and professionals/providers. The Bay City PRA cites code PI131 which reflects a claim specific negotiated discount.

50.     United's pricing determinations for all three procedures, as properly delegated to Data iSight, conflicted with the requirements of the Plan stated in plain language. The PRA merely states Data iSight utilizes "paid data" without mention of whether the fees are competitive or whether they are restricted by geographic area—specifications required under the Plan and supported by United's website. The Data iSight pricing statement is of no help, as it is also devoid of any mention of competitive fees or geographic areas. There is no evidence within the administrative record, or any extrinsic evidence proffered by Deloitte, on what Data iSight is or how it makes its pricing determinations.

**Remand**

51.     "Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance." *Pannebecker v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1213, 1221 (9th Cir. 2008). The Court therefore remands this claim to the administrator for further

processing of Dancekelly's claims consistent with this Order. *Accord Hegarty v. AT & T Umbrella Benefit Plan No. 1*, 109 F. Supp. 3d 1250, 1258 (N.D. Cal. 2015); *Cherene v. First Am. Fin. Corp. Long-Term Disability Plan*, 303 F. Supp. 2d 1030, 1041 (N.D. Cal. 2004). Because Dr. Rim is an assistant surgeon, his claim reimbursement should be calculated in accordance with the Plan's provision on assistant surgeons.

## III.

## CONCLUSION

In light of the foregoing, the Court finds in favor of Plaintiff Dancekelly and against Defendant Deloitte. In sum, the Court concludes United, the claims administrator, procedurally erred by: (1) failing to provide specific reasons when denying the hiatal hernia repair; and (2) failing to provide copies of the Plan and recordings of the calls between the doctors and United.

Under an abuse of discretion standard of review, the Court concludes United's denial of Dr. Farzin Michael Feizbakhsh/Advanced Weight Loss Surgical's and Dr. Sean Rim/Minimally Invasive Surgical Association's claim for the hiatal hernia repair and partial reimbursement of the lap band removal and sleeve gastrectomy were an abuse of discretion. Specifically, the Court concludes: (1) Dr. Sean Rim's claims were properly exhausted; (2) United's determination that the hiatal hernia repair was incidental to the sleeve gastrectomy was illogical, implausible, and without support in the factual record; and (3) United's pricing determinations, as delegated to Data iSight, conflicted with the requirements of the Plan. The Court remands this claim to the Claims Administrator for a re-determination of the claims consistent with this Order.

DATED: February 26, 2026

_____
DOLLY M. GEE
CHIEF U.S. DISTRICT JUDGE